**SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff,**

v.

**AMERICAN BERYLLIUM & OIL COR-
PORATION et al., Defendants.**

No. 68 Civ. 1939.

United States District Court
S. D. New York.

July 3, 1968.

See also D.C., 303 F.Supp. 912, D.C.,
47 F.R.D. 66.

———◆———

Mahlon M. Frankhauser, Regional Ad-
ministrator, New York City, Atty. for
plaintiff, David B. Bliss, Asst. Regional
Administrator, Donald N. Malawsky,
Marvin G. Pickholz, New York City, of
counsel.

Saul Horing, New York City, for de-
fendants American Beryllium & Oil
Corp. and Aagaard.

Jerome Lewis, William P. Ruffa, New
York City, for defendant Von Hesse.

Cally & Cally, New York City, for de-
fendant Persoff; Frank R. Cally, New
York City, of counsel.

Rothman, Newfield & Miller, New
York City, for defendant Gottlieb; Ber-
nard Rothman, New York City, of coun-
sel.

Archibald Palmer, New York City, for
defendant Williams.

Louis Vernell, Miami Beach, Fla., for
defendants Vernell, Burnett, Davanzo,
Western Minerals, Inc. and Imperial Sul-
phur and Minerals Corp.

### OPINION

McLEAN, District Judge.

This is an action to enjoin alleged vio-
lations of the Securities Act of 1933 and
the Securities Exchange Act of 1934.
The complaint contains four counts.
Briefly stated, plaintiff Securities and

Exchange Commission charges that all defendants have (1) sold unregistered stock of American Beryllium & Oil Corporation (ABO) in violation of Sections 5(a) and 5(c) of the 1933 Act (15 U.S.C. §§ 77e(a) and 77e(c)); (2) sold and offered to sell ABO stock by means of untrue statements of material facts and omissions to state material facts in violation of Section 17(a) of the 1933 Act (15 U.S.C. § 77q(a)); (3) done the same thing in violation of Section 10(b) of the 1934 Act (15 U.S.C. § 78j(b) and Rule 10b–5 thereunder); (4) while engaged in these activities, have purchased ABO stock for accounts in which defendants had a direct or beneficial interest, in violation of Section 10(b) of the 1934 Act (15 U.S.C. § 78j(b) and Rule 10b–6 thereunder).

Plaintiff moves for a preliminary injunction. The court held a hearing and took testimony on June 4, 5 and 6, 1968. At the conclusion of the hearing, plaintiff withdrew its motion as against defendant Davanzo. Meanwhile, two defendants, Tallman and Bornstein, who are securities salesmen employed by brokerage houses, consented to a permanent injunction. All other defendants have resisted the motion. Defendant Von Hesse, however, filed no opposing affidavit and defendant Williams filed none until the hearing was over, at which time the court permitted him to file one. Only one defendant, Burnett, took the witness stand.

The court will base its findings upon the facts developed at the hearing plus such of the facts in the voluminous moving papers as are not controverted by defendants.

The court deems it unnecessary on this motion to consider the fourth count in the complaint. There was little evidence on this charge and it is not an important aspect of the case. The other three counts in substance come down to two, i.e., selling unregistered ABO stock and selling ABO stock or offering it for sale on the strength of false representations. Although the complaint charges each defendant with both offenses, it is apparent from the evidence that not every defendant is involved with both. Indeed, plaintiff conceded as much at the conclusion of the hearing, for it then pressed the first charge only against defendants Aagaard, Von Hesse, Persoff, Gottlieb and Williams, although it asserted the second charge against all defendants. It is also apparent that some of the defendants charged with a violation of Section 17 of the 1933 Act and Section 10(b) of the 1934 Act in connection with the sale of ABO stock did not own any ABO stock and did not sell or offer to sell any. Hence, as to them, the charge comes down to one of complicity in the acts of the other defendants.

Broadly speaking, the activities complained of fall into two main categories: (1) activities of certain defendants carried on in late 1967 and early 1968 in an attempt to create an artificial market for ABO stock; (2) activities having to do with a potential sulphur mine on Isla Isabela, one of the Galapagos Islands, which involved an allegedly false press release issued on March 7, 1968, relating to proposed mining operations there. The testimony at the hearing was devoted primarily to the second of these subjects, i.e., the sulphur mine. Evidence on the first subject, therefore, must be found almost entirely in the moving papers. The moving affidavit is made by a Commission investigator who obviously has no first-hand knowledge of the facts. He has attached to his affidavit, however, copies of documents, affidavits of various persons and extracts from the testimony of various persons before the Commission. Many of the facts thus presented are uncontroverted.

### The Section 5 Charge of Selling Unregistered Stock

This charge involves defendants Aagaard, Von Hesse, Persoff, Gottlieb and Williams. The relevant facts are as follows.

ABO is a Nevada corporation incorporated in 1957 under the name of Great Divide Oil Corp. It changed its name to ABO in 1961. Its offices are in Salt

Lake City. Defendant Aagaard is its president and a principal stockholder. According to its unaudited balance sheet, as of January 31, 1968 it had current assets of $12,610.22 and current liabilities of $81,222.48.

ABO's stock is not registered with the Commission. In 1957 the Commission granted it exemption from registration under Section 3(b) of the 1933 Act and Regulation A thereunder. Under this exemption, 141,487 shares of stock were sold to the public. On August 20, 1963, the Commission permanently suspended ABO's exemption, which it had previously suspended temporarily on July 23, 1962. It did so because ABO failed to disclose that Aagaard had been expelled from membership in the National Association of Securities Dealers.

In the late summer of 1967, Von Hesse and Williams, with Aagaard's knowledge and assistance and with the assistance of Aagaard's attorney, Walker, set up an escrow account in a Salt Lake City bank. Von Hesse employed Morris Kunz, a former associate of Aagaard, to communicate with stockholders of ABO with a view to inducing them to grant an option to Von Hesse and Williams to buy their ABO stock at a price of $1.125 per share. The stockholders were asked to deposit their shares in the escrow account, to be delivered to Von Hesse and Williams when the option was exercised. The stockholders were paid one cent per share as consideration for the option.

Kunz communicated with over 50 ABO stockholders. Approximately 31 of them granted the options and deposited their shares in the escrow account. A total of 52,950 shares of stock were so deposited.[1]

On October 13, 1967, Aagaard's attorney, Walker, sent a letter to National Quotation Bureau, Inc., the publisher of the "pink sheets" of quotations for unlisted securities. The letter stated that ABO had filed three offering circulars with the Commission dated respectively March 19, 1959, January 29, 1960 and March 19, 1962 in accordance with the exemption from registration provided by Regulation A. On October 18, 1967, Aagaard wrote to National Quotation Bureau, Inc. enclosing copies of these circulars. Neither letter stated that ABO's exemption had been suspended by the Commission. The purpose of these letters was to provide the Bureau with background information on ABO as a foundation for future requests to the Bureau to list offers to buy and sell ABO stock in the pink sheets.

In October 1967, Williams told a broker, Danielson, that Williams' wife was interested in buying ABO stock. The broker had never heard of it. He inserted a bid in the pink sheets indicating that he was interested in buying the stock. On October 25, 1967, another broker, Francis I. duPont & Company, offered Danielson 2,000 shares of ABO stock at $1.25 per share. Danielson bought these on Mrs. Williams' instructions. She told him that she wished to "stay in the sheets." Shortly thereafter duPont offered Danielson another 2,000 shares of ABO stock at $1.50 per share. Danielson bought this for Mrs. Williams. Subsequently, Danielson bought for Mrs. Williams from duPont a third block of 2,000 shares at $1.50 per share.

The first block of 2,000 shares purchased by Mrs. Williams at $1.25 per share was sold by Russell Kunz, brother of Morris Kunz. The other two blocks of 2,000 shares each purchased by Danielson for Mrs. Williams' account at $1.50 per share were sold by Aagaard.

On or about October 31, 1967, Von Hesse placed an order with First Han-

---

[1]. During the course of this solicitation, Aagaard, as president of ABO, wrote a letter to ABO stockholders stating that it had come to the attention of ABO's management that "agents of another company" were contacting stockholders seeking options to buy their stock at $1.125 per share. Whatever the purpose of this letter may have been, it is clear that Aagaard knew that the solicitation was being conducted, not by agents of another company, but by his associates Williams and Von Hesse.

over Corporation, with which defendant Tallman was then connected, to buy 1,000 shares of ABO stock at $1.25 per share. First Hanover placed a bid in the pink sheets. This made the second indication in the pink sheets of buying interest in the stock.

On November 13, 1967, Aagaard sold 500 shares of ABO stock to Danielson who bought it for another customer. The price was $2.50 per share. Also on November 13, 1967, Aagaard sold 1,000 shares to First Hanover Corporation. The price of this block was $3.25 per share. On November 14, Aagaard sold 1,000 shares to another broker at $4.25 per share.

Between November 13 and November 24, 1967, Von Hesse sold three blocks of 1,000 shares each of ABO stock and one block of 500 shares at prices per share of $3.125, $4.00, $4.00, and $4.25 respectively. Three of these blocks were sold through defendant Bornstein. Between December 8, 1967 and March 18, 1968, Von Hesse bought 3,500 shares and sold 8,000 shares at prices per share ranging from $4.875 to as high as $16.00.

Williams sold 300 shares on December 11, 1967 at $5.375.

Gottlieb and Persoff (also known as Percell) were friends and associates of Von Hesse and Williams. They had a few transactions in ABO stock.

Between December 5, 1967 and February 5, 1968, Gottlieb purchased 1,000 shares and sold 3,400 shares at prices ranging from $5.00 to $8.50 per share.

Between December 13, 1967 and January 11, 1968, Persoff purchased 200 shares and sold 800 shares at prices ranging from $6.125 to $8.75 per share.

Throughout this period, Von Hesse exercised his option to purchase ABO stock which had been deposited in the escrow account in the bank in Salt Lake City. The option was exercised on 22,250 shares at $1.125 per share. At times Von Hesse exercised the option in his own name, at other times he directed that the stock be registered in the names of Gottlieb or Persoff.

It is reasonably clear that ABO stock was not worth even the option price of $1.125 per share, let alone the highly inflated price of $16.00 per share which it eventually reached as a result of these manipulations. It is equally clear that Aagaard was a controlling person of ABO within the meaning of the 1933 Act, and that Von Hesse and Williams, and to a lesser extent Gottlieb and Persoff, were persons associated with him in this enterprise who, on the evidence to date, can fairly be said to be part of a control group. Although the uncontroverted proof does not establish that Aagaard sold more than 6,500 shares, which is slightly less than one per cent of ABO's outstanding stock, nevertheless the court considers it unlikely that Aagaard will be able to convince the trial court that he is protected by Regulation 154 under the 1933 Act upon which he relies. That regulation provides in substance that for certain purposes a sale of less than one per cent of the outstanding securities of a corporation is not considered a "distribution" of securities within the meaning of the Act. It would seem that the sales of the entire group should be considered, not merely those of one individual member. Here, the sales of the group as a whole substantially exceeded one per cent.

Final decision of this question should await the trial when all the facts as to the closeness of the association of this group of defendants can be developed. For present purposes, it is sufficient to say that plaintiff has made a prima facie showing of a right to relief and has demonstrated a strong probability of success on this branch of the case at the trial. There is adequate evidence of the use of the means of communication of interstate commerce. A preliminary injunction is obviously necessary to restrain, during the pendency of this action, these activities which are calculated to cause loss to the gullible investing public.

*The Section 17 and Section 10(b) Charge Involving the Sulphur Mine*

This charge is made against all defendants. The relevant facts are as follows.

There is a deposit of sulphur in the crater of the Santo Tomas volcano on Isla Isabela in the Galapagos Islands, which belong to Ecuador. This fact has been known for years. As early as 1953, Banfield, a geologist, who testified as a witness for plaintiff, inspected this deposit. He considered it unfeasible to exploit commercially. The island is hot and barren. There appears to be little fresh water available. The island is very sparsely inhabited. There are no roads from the coast to the volcano. There is no well-developed port on the coast. The volcano gives off noxious fumes which are dangerous to human life.

Despite the many difficulties, however, the Government of Ecuador is interested in attempting to develop a successful mining operation in the crater. in 1967 it granted to Galapagos Azufre Compania S.A. (Azufre), an Ecuadorian corporation apparently controlled by defendants Vernell and Davanzo, the right to explore the deposit with a view to determining whether commercial exploitation would be feasible. Defendant Imperial Sulphur & Minerals Corp. (Imperial), another Ecuadorian corporation also controlled by Vernell and Davanzo, apparently succeeded, in a manner which the testimony does not make entirely clear, to the rights of Azufre. The evidence indicates that Vernell is the moving spirit in this corporation.[2]

Vernell apparently did not have sufficient capital to undertake this exploration. He looked around for a partner and found one in Canyon State Mining Corporation (Canyon), a Nevada corporation, not a defendant in this action, whose president was a certain Captain Delaney, who was not called as a witness at the hearing. On July 20, 1967, Azufre and Canyon entered into a joint venture agreement by which Canyon undertook to carry out certain exploration activities on Isla Isabela.

Canyon sent a geologist, O'Toole, to the island to examine the deposit. O'Toole testified at the hearing. He impressed the court as a candid and honest witness.

On September 10, 1967, O'Toole rendered a report to Canyon which may be briefly summarized as follows. O'Toole examined a vein of sulphur 100 feet wide which was exposed in the crater of the volcano. He took samples from the surface. The samples averaged over 90 per cent in purity. O'Toole expressed the opinion that, "assuming" that the 100-foot wide vein continued downward for 200 feet, the deposit would contain "up to" one million tons of sulphur-bearing material. He pointed out that he could not tell merely by looking at the surface whether the vein did in fact descend to a depth of 200 feet and that only drilling could establish the answer to that question. His report mentioned the practical obstacles to successful mining, *i.e.*, high temperature, the noxious gases, the unavailability of water and the absence of any roads. He concluded, however, that the property was worth further exploration and recommended that a drilling program be established.

The stockholders of Canyon decided to form a new Nevada corporation, Western Minerals, Inc. (Western), to pursue this project rather than to carry it on in the name of Canyon. The details of how this was done are hazy but are unimportant for present purposes. Delaney became president of Western which is a defendant here.

On August 2, 1967, defendant Burnett was hired by Western to take charge of this project. Shortly thereafter he became executive vice president of Western. Burnett is a Nevada businessman. He had had no previous mining experience. He testified at the hearing.

---

2. There was so little evidence as to Davanzo's activities that plaintiff withdrew its request for a preliminary injunction against him.

From August 1967 until late February 1968, Western and Burnett had no connection with ABO or with Aagaard or his associates Von Hesse, Williams, Gottlieb and Persoff. How that connection eventually came about will be briefly related hereinafter.

In the early fall of 1967, Western attempted to assemble information pertaining to the project. It obtained engineering advice on a drilling program. It secured advice as to the equipment which would be needed for exploration and also for eventual mining if that should prove feasible. It obtained advice on techniques which could be used to minimize the danger of the noxious gases. It considered ways and means of producing fresh water from sea water in the event that should prove to be the only available source. It considered data provided by an Ecuadorian geologist, Dr. Kraglievitch, who had been to the island. It obtained comments on this data from an American metallurgist, Schrumn. As a result of this investigation, Burnett appears to have become enthusiastic over the prospects of eventual success.

In October 1967, Burnett, on behalf of Western, secured a so-called "waiver letter" from the Agency for International Development (AID) of the Department of State. In substance this amounted to permission to Western to proceed with the exploration for one year without prejudice to its rights eventually to seek from AID a "specific risk guarantee," a form of insurance. Granting the waiver did not commit AID to issue the insurance if Western should later apply for it.

In January 1968, because of the unfavorable balance of international payments, new regulations were issued which had as their purpose the discouraging of American investment abroad, contrary to the purpose of AID which was to encourage such investment. These new regulations were administered by the Office of Foreign Direct Investments (OFDI) of the Department of Commerce. Burnett was successful in January 1968 in obtaining from OFDI "special authorization" to Western to invest up to $1,000,000 in 1968 in the Isla Isabela project.

Despite all these preparations, there was still one feature missing in January 1968. That was money. Delaney assured Burnett that he could obtain the necessary funds from sources in Los Angeles. It turned out, however, that he was unable to raise as much as was thought necessary. Vernell became dissatisfied with Western's progress in carrying out the joint venture agreement.

At this point Vernell turned for assistance to ABO, which previously had had no connection with this project. It is suggested that Williams introduced him to Aagaard and Von Hesse, but the testimony on this subject is not very explicit. The eventual result was that Vernell and Davanzo acquired all the stock of Western in return for a promise to pay the former stockholders a royalty on the eventual production of sulphur. Vernell and Davanzo then transferred their Western stock to ABO in exchange for 115,000 shares of ABO stock. Western thereupon became a wholly-owned subsidiary of ABO. On February 22, 1968, Vernell's Ecuadorian company, Imperial, and Western entered into a new joint venture agreement by which Western undertook to send an engineering party to Isla Isabela to "make a study of the geology and mining problems involved" and to report thereon by May 1, 1968 to Imperial and to the Minister of Mines of Ecuador.

At this point Delaney disappeared from the scene. Burnett, however, remained as executive vice president of Western in charge of the project. He has worked on it ever since at a salary of $2,000 per month which has not been paid. Burnett was given to understand by Aagaard that ABO would be able to finance the exploration. According to Burnett's testimony, he was given no details as to ABO's finances and did not ask for any.

Burnett made his office in Quito, Ecuador from late February 1968 until May 23, 1968. He made four different trips to Isla Isabela during that period.

Early in March Aagaard, Von Hesse, Gottlieb and Williams went to Quito. They were present at a meeting there which was attended by Burnett, apparently also by Vernell, and by various Ecuadorian officials. A few days later a party of Ecuadorian officials, which included an American official of AID, was taken on a flight over Isla Isabela. Some, if not all, of the defendants mentioned were included in the party. The evidence is not precise as to just who was included, but it is clear that at least Burnett and Aagaard were among those present. The trip seems to have been undertaken primarily for publicity and "good will" purposes.

On March 19, 1968, Western sent an exploring party of some twenty-two men to Isla Isabela. The party included drillers, road surveyors and workmen. They remained there until shortly before the hearing in this action, when they left, primarily for reasons of health, according to Burnett, and apparently also because of some difficulties which had developed in meeting the payroll in the last weeks of the expedition's stay.

Western did not make the report which the joint venture agreement required it to make by May 1. The drillers did make certain reports of their results to Burnett's office in Quito, but he did not produce these at the hearing.

On May 24, 1968, Vernell, on behalf of Imperial, wrote to ABO terminating the joint venture agreement because of Western's failure to perform.[3] In this letter he and Davanzo returned the 115,000 shares of ABO stock which had been issued to them in exchange for their Western stock at the time the joint venture agreement was made. Apparently ABO has not acquiesced in this termination of the joint venture agreement and controversy on this subject now exists between ABO and Western on the one hand and Vernell, Davanzo and Imperial on the other.

According to Burnett, the Ecuadorian government has not withdrawn the permission which it granted to Imperial to explore Isla Isabela. Relations between the Ecuadorian government and defendants, however, have cooled perceptibly as a result of this litigation.

The relevance of all this to plaintiff's charge of violation of Sections 17 and 10(b) arises from a press release which Aagaard, on behalf of ABO, instructed a public relations agent, Wiley, to issue in March 1968. Wiley sent it to various newspapers on March 7. Several of the newspapers published it and gave it wide circulation. This release was a substantially verbatim copy of a cable which Burnett, on Aagaard's instructions, sent to Wiley from Quito on March 6.

The full flavor of this release can be appreciated only by quoting it in full. It read as follows:

"Quito, Ecuador, March 6, 1968—The Ecuadorian Ministry today reaffirmed and fully confirmed the right of Western Minerals Inc., a wholly owned subsidiary of American Beryllium and Oil Corp., to further explore, mine, mill, ship and export sulphur from Isla Isabela, the largest island in the Galapagos Archipelago. The tremendous scope of the project requiring the combined technological and engineering skills of both Ecuadorian and United States personnel has already received the full approval of both the United States Agency of International Development (AID) a component of the U.S. Department of State and the new office of Foreign Direct Investment under the direction of the U.S. Department of Commerce.

Previous geological studies and surveys conducted by Western Minerals Inc., a division of American Beryllium and Oil Corp., under the direction of Walter O'Toole, consultant geologist,

3. This letter was written some ten days after this action was begun on May 13, 1968.

indicated a deposit of one million tons of high purity sulphur in the Santo Tomas Crater.

Elmer K. Aagaard, President of American Beryllium and Oil Corp., and Stephen Burnett, Executive Vice President of Western Minerals Inc., in conjunction with Oswaldo Chiriboga, Manager of Imperial Sulphur and Minerals Corp. of Ecuador, announced today in Quito that a full complement of technological and engineering personnel will depart for the Island by March 15th to complete the final design and system for a comprehensive mining and milling operation. The crew will also block out anticipated additional ore reserves by extensive deep drilling and will further design facilities for docks, roads, housing, hospital, church and school for the new community. These studies comprise one of the last stages of American Beryllium Oil Corp.'s overall program to put the Isla Isabela sulphur project into full production as soon as possible."

Burnett testified that when he sent this cable he believed it to be true and that he still believes it to be true. He readily admitted, however, that perhaps some of the language of the cable might seem unhappy in the light of subsequent developments.

The court was impressed by Burnett's apparent sincerity on the witness stand. He said that he still believes that it will be feasible to mine this sulphur, provided that the exploration can be completed to the point at which a rate of eventual production can be definitely predicted. He expressed the opinion that once that stage is reached, financing will not be difficult to obtain, as sulphur is in great demand.

The court is not asked to enjoin any of these defendants from proceeding with this project, if they are in a position to do so. The court has no desire to prevent them from so doing, nor is it concerned with the controversy between Imperial, Western and ABO as to whether ABO and Western have failed to perform the joint venture agreement. Moreover, on the evidence to date, the court is not persuaded that this expedition to Isla Isabela, the preparation and carrying out of which seem to have taken considerable planning and the expenditure of at least an appreciable sum of money, was a mere stunt to facilitate the sale of ABO stock to the public. Plaintiff has not shown that Imperial and Vernell and Western and Burnett were not seriously interested in exploring the feasibility of mining this sulphur in the hope that mining could be accomplished on a commercially profitable basis.

The fact remains, however, that whatever Burnett may have believed, his cable and the press release which embodied it were overly enthusiastic, to say the least. The overall impression which the release gave to the reader was misleading. Matters were not nearly as far advanced as the press release implied.

Moreover, fault can be found with specific words of the release as well as with its overall tone. Thus, it could not fairly be said, on the basis of AID's "waiver letter" and OFDI's investment authorization, that these United States Government Departments had given "full approval" to the "tremendous scope of the project requiring the combined technological and engineering skills of both Ecuadorian and United States personnel." Nor was it accurate to say that O'Toole had "indicated" a deposit of one million tons of sulphur. O'Toole had been careful to say that only drilling could provide an accurate estimate. Finally, it was misleading to refer to the designing of "facilities for docks, roads, housing, hospital, church and school for the new community" as "one of the last stages of American Beryllium and Oil Corp.'s overall program to put the Isla Isabela sulphur project into full production as soon as possible." There are no docks, roads, houses, hospitals, churches or schools. There is no new community. At the moment, at least, it seems improbable that there will be any in the foreseeable future.

■ The court finds that the press release was false and misleading within the meaning of Section 17(a) of the 1933 Act and Section 10(b) of the 1934 Act.

Burnett owned no ABO stock and, as far as appears, he did not intend to buy or sell any. But he composed the cable and bears the responsibility for it. He knew that the cable was going to a public relations agent to be used as a foundation for a press release. He understood that Aagaard desired it for that purpose. He must have known that the statements in it would enhance the value of ABO stock in the minds of potential buyers.

As far as Aagaard is concerned, it seems manifest that he intended to and did issue the press release in order to affect the price of the stock. He must have realized that it gave a misleading impression.

There is some evidence, not very extensive, to show that some of the other defendants made use of the sulphur project in general and the press release in particular in an effort to induce people to buy ABO stock. In late February 1968, Gottlieb urged an airline stewardess to buy ABO stock through her broker, who was an acquaintance of Gottlieb. Gottlieb told her that he was on his way to Quito and that there would soon be an article in the newspapers about ABO's "sulphur discovery" which would put the price of the stock up.

On another occasion, Gottlieb made a substantially similar remark to a Miss Kesten, and on a third occasion he told a restaurant proprietor about ABO's sulphur mines in Ecuador which he, Gottlieb, was going to visit.

In January 1968 Von Hesse and Williams told Tallman that they were negotiating for a sulphur property in the Galapagos Islands, and that this property had reserves of from one million to one and a half million tons of sulphur. Von Hesse told Tallman that ABO could earn 50 cents to 75 cents per share in 1968 from sulphur production.[4]

There is insufficient evidence to show that Persoff made any misrepresentations with respect to the sulphur project, or for that matter with respect to any other subject, in connection with the sale of ABO stock or in connection with offers to sell it.

As to Vernell, and his company Imperial, the court believes that the evidence is also insufficient to justify a preliminary injunction. There is no evidence that Vernell or Imperial sold or attempted to sell ABO stock. There is not enough evidence to warrant a finding that Vernell had a hand in the preparation of Burnett's cable.

The court concludes that plaintiff has made a sufficiently strong showing of probability of ultimate success at the trial on this branch of the case, and has demonstrated a sufficient need for preliminary relief, to warrant the granting of a preliminary injunction against violations of Section 17 and Section 10(b) against all defendants except Imperial, Vernell and Persoff.

There is a sufficiently adequate showing of the use of the facilities of interstate commerce to satisfy the statutory requirement on that score.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

Plaintiff's motion for a preliminary injunction is granted to the following extent:

1. Defendants Aagaard, Von Hesse, Persoff, Gottlieb and Williams will be enjoined pendente lite from acts consti-

---

4. Plaintiff has submitted an affidavit of a broker, Baker, who says that on or about March 20, 1968, Williams told him that he had been to Ecuador, that he had visited the sulphur project, that a geologist had confirmed a "tremendous" amount of sulphur and that it was a proven deposit. Williams' belatedly filed affidavit obliquely denies this statement. In view of the issue of fact thus created, the court will not take the Baker affidavit into consideration.

tuting a violation of Sections 5(a) and 5(c) of the 1933 Act.

2. Defendants American Beryllium and Oil Corporation, Aagaard, Von Hesse, Gottlieb, Williams, Burnett and Western Minerals, Inc. (Burnett's employer) will be enjoined pendente lite from acts constituting a violation of Section 17(a) of the 1933 Act and Section 10(b) of the 1934 Act and Rule 10b–5 thereunder.

In all other respects, the motion is denied.

Settle order on notice.